United States Courts
Southern District of Texas
FILED

*June 03, 2025*

Nathan Ochsner, Clerk of Court

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| S.R., Deceased, LAURA ROMO, and | § | |
| OMAR ROMO, Individually, and as | § | |
| Independent Administrator of the Estate | § | |
| Of S.R. Deceased, | § | C.A. No.: 4:25-00508 |
|     Plaintiffs, | § | |
| | § | |
| v. | § | **JURY DEMAND** |
| | § | |
| SPRING BRANCH INDEPENDENT | § | |
| SCHOOL DISTRICT, JAMILA TRESSIE | § | |
| SPENCER and SOLIANT HEALTH, LLC | § | |
| d/b/a SOLIANT HEALTH | § | |
|     Defendants. | § | |

## PLAINTIFFS FIRST AMENDED COMPLAINT

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW S.R., Deceased ("the Student") and his parents, Laura and Omar Romo, Individually and as Independent Administrator of the Estate of S.R., (collectively "Plaintiffs " herein) alleging that the Defendants Spring Branch Independent School District (hereinafter referred to as "SB ISD" or the "School District"), Jamila Tressie Spencer and Soliant Health, LLC d/b/a Soliant Health violated the various rights of S.R., all as more specifically pled herein. Plaintiffs reserve the right to replead if new claims and issues arise upon further development of the facts, and as permitted by law. In support thereof, Plaintiffs would respectfully show this tribunal the following:

### I. INTRODUCTION

1.    S.R., was born with significant cognitive and physical disabilities, had primitive communication skills and was legally blind. Accordingly, one accommodation he required whether at home, or in the community and at school was very close supervision. This need

for supervision was especially pronounced, because S.R. had a propensity to put things into his mouth and swallow them but sadly School District Staff did not fulfill their duty. In fact, there were a number of incidents at School where S.R. swallowed items- he even required medical care for some of them. His parents devised another rather simple accommodation, the use of a "chewy toy" to be tethered to S.R. at all times, so that he would not seek the more dangerous items to put into his mouth. But District Staff failed to assure this simple accommodation was followed as well. His parents suggested another accommodation- that they would pay for a one-to-one escort for S.R. when at School. They refused this offer as well. Sadly, and on February 6, 2023, S.R. went to the gymnasium, was without out the close supervision, was without his chewy toy and swallowed a piece of plastic glove. He staggered around the gymnasium, obviously in distress yet none of the District Staff assisted him at all. The School Board had contracted with Soliant Health Care to provide extra support, who in turn hired Jamila Tressie Spencer to assist. She turned out to be a bad fit, as she played on her telephone while S.R. was gasping for air right in front of her. Finally, the School Nurse came to assist but she didn't even think of checking S.R. for a blockage and applied CPR which likely made things worse. Sadly, and among the many School Board Policies & Procedures promulgated, they failed to have a policy on how to keep and secure cleaning materials like safety gloves. The also failed to enact a Policy & Procedure to address medical emergencies when a person's ability to breath was compromised because an airway was blocked. Obviously the School Board failed to assure staff were supervised and trained on this health and life safety measures.

2.     As such and for reasons more fully described below, Plaintiffs file this their *First Amended*

*Complaint* with claims pursuant to the 4th and 14th Amendments to the United States Constitution, discrimination based upon disability pursuant to Section 504 of the Rehabilitation Act of 1973 ("Section 504"), 29 U.S.C. §794 et seq. and the Americans With Disabilities Act ("ADA"), 42 U.S.C. § 12131 et seq. against the Defendant School District, and Soliant Healthcare, LLC and Common Law claims against both Soliant Healthcare, LLC and Jamila Tressie Spencer.

## II. JURISDICTION

3.  Jurisdiction is conferred upon this Court pursuant to 28 U.S.C.A. §1331 and §1343 because the matters in controversy arise under the Constitution and laws of the United States.

## III. VENUE

4.  Pursuant to 28 U.S.C. §1391 this Court is the proper Venue over this cause, as all events and omissions giving rise to Plaintiff claims occurred in the Southern District of Texas, Houston Division.

## IV. PARTIES

5.  Plaintiffs reside at 14403 Still Meadow Drive, Houston, Texas 77079. For all times relevant to this complaint, S.R. while alive, lived with his parents at the same address.

6.  The Spring Branch Independent School District is a school district organized under the laws of the State of Texas. They have been served and have answered by and through their counsel of record, the Honorable Mr. Paul A. Lamp, Attorney and Ms. Melissa M. Goins, Attorney with the Law Firm of Spalding, Nichols, Lamp, Langlois, 3700 Buffalo Speedway, Suite 500, Houston, Texas 77098.

7.  Jamila Tressie Spencer, is an individual in this cause, has been served and has answered by

and through her counsel of record the Honorable Chris Raney and Kayla C. Miller, attorneys with the Law Frm of Gordon Rees Scully Mansukhani LLP, 1900 West Loop South, Suite 1000, Houston, Texas 77027.

8.    Soliant Heahl LLC d/b/a Soliant Health has been served and has answered by and through their counsel of record the Honorable Chris Raney and Kayla C. Miller, attorneys with the Law Firm of Gordon Rees Scully Mansukhani LLP, 1900 West Loop South, Suite 1000, Houston, Texas 77027.

## V. STATEMENT OF FACTS

A.    ABOUT THE PLAINTIFF

9.    S.R. was born on February 6, 2008. S.R. was diagnosed with Williams-Beuren Deletion Syndrome ("Williams Syndrome")[1] and Autism Spectrum Disorder ("ASD."[2] While alive he had significant cognitive impairments. He also experienced Cortical Blindness also called CVI (cortical vision impairment) which made processing visual information difficult for him. He was considered legally blind.  He also had a history of seizures and needed significant assistance with all of his self-help skills, including but not limited to eating, bathing, toileting, sanitation and dressing.

---

[1].  Williams-Beuren syndrome, also known as WBS, is a rare genetic disorder that affects various parts of the body. It is caused by the deletion of a small piece of chromosome 7. This missing genetic material leads to a range of physical and developmental issues. While the exact reasons for this deletion are not fully understood, it is believed to occur randomly during the formation of reproductive cells or early fetal development. Common symptoms include developmental delays, learning difficulties, and intellectual disabilities that vary in severity among affected individuals.  https://en.wikipedia.org/wiki/Williams_syndrome

[2].  Autism spectrum disorder[a] (ASD), or simply autism, is a neurodevelopmental disorder characterized by repetitive, restricted, and inflexible patterns of behavior, interests, and activities, as well as difficulties in social interaction and social communication. Sensory processing differences can impair functioning in different areas, such as developing social relationships or performing instrumental activities of daily living. https://en.wikipedia.org/wiki/Autism

10.     Even with these limitations, he had a good and thriving life. He lived at home with his loving parents and younger sister.  Like many other young people he enjoyed watching videos, listening to music and going on outings.  He particularly liked going to the mall.  S.R. was an avid walker and would walk anywhere and everywhere he could.  He also loved the water and would swim and float on his belly in the community pool, often as long as his parents would let him.  He was particularly close to his sister, and she to him- as she was just a year younger.  He would throw himself in her lap and enjoy the mutual contact.

11.      His teachers reported S.R. enjoyed social interactions not only with family, but teachers and peers as well.  As to all he would often smile and vocalize during these interactions.  While his communication skills were primitive he was able to communicate through assistive technology including a voice output device.   He loved listening to video songs like Five Fingers, 5 Little Monkeys Jumping on the Bed and many more.  He was able to follow along by touching the correct number on a device.  S.R. liked to listen to a  weather song every day and would look out the window at school to check the weather.  He was able to push a button on a pad to respond to an adult's greeting or say goodbye and let someone know if he was hungry. S.R. liked to be outside more so then inside and one of his favorite activities was to swing on a hammock at home.  He enjoyed walking and ambulated independently both inside and outside the classroom.  At home he will hold and grab a fresh diaper to let his parents know he needs to be changed.  When hungry he would grasp a utensil and can feed himself, but often put too much food on the utensil. Overall he does not have difficulty interacting and receiving instruction from staff.

12.     Unfortunately S.R. was not able to decipher between safe and unsafe objects and would often

place either in his mouth and had history of swallowing them.[3] His parents had significant

concerns about their son's safety at School because staff used rubber gloves while providing

services to their son during the day. This included feeding, toileting and sanitation so there

was a concern the gloves be both stored and discarded safely. For this reason, whether at

home, in the community and at school he has access to a chewy toy as safe object he could

chew on and use as a replacement for dangerous objects. His parents found that giving their

son a "chewy toy" helped him avoid swallowing other more dangerous objects. Accordingly,

they put the chew toy in his backpack that went to and from school every day. At school R.S.

received Special Education services.

B.    ABOUT THE INDIVIDUALS WITH DISABILITIES EDUCATION ACT

13.    The *Individuals with Disabilities Education Act* (IDEA) is a piece of federal legislation that

ensures students with disabilities are provided with what is termed a *Free Appropriate Public*

*Education* (FAPE). The term "special education" means specially designed instruction, at no

cost to parents, to meet the unique needs of a child with a disability, including—instruction

conducted in the classroom, in the home, in hospitals and institutions, and in other settings

and instruction in physical education.

14.    Personnel with particular training and expertise in the area, must collaborate with the child's

family to develop what is called an *Individualized Education Program* (IEP). The student

must be placed in what is called the *Least Restrictive Environment* (LRE). This IEP is

---

[3]. Pica is the craving or consumption of objects that are not normally intended to be consumed. It is classified as an eating disorder but can also be the result of an existing mental disorder. The ingested or craved substance may be biological, natural or manmade. https://en.wikipedia.org/wiki/Pica_(disorder)

intended to provide the student academic and non-academic benefits and includes what is termed "related services"[4]

15.　　It may include what is termed a *Behavioral Intervention Plan* ("BIP") to address a student's injurious behaviors to themselves or others. The IEP also provides for an number of *accommodations* to assure the student can access public school education services to the same extent as their non-disabled peers.

16.　　The IDEA provides the parents a number of *Procedural Safeguards* permitting them to file a complaint with the Texas Education Agency (TEA) if they believe the School District has failed to provide their child all the services they may be otherwise entitled to under the IDEA.

17.　　If the purported failures rise to the level of what is called a *Gross Misjudgment or Mismanagement Of the Child's Educational Plan* the parent can seek a civil remedy in federal court, as S.R.'s parents are seeking in this cause.

B.　　ABOUT THE SPRING BRANCH INDEPENDENT SCHOOL DISTRICT

　　1.　　Disability Discrimination

18.　　The School Board has developed policies and procedures regarding discrimination based upon disability. *See* FB (LOCAL), FB (LEGAL) EQUAL EDUCATIONAL OPPORTUNITY. They are based upon and taken from commentary found in the statute,

---

[4]. The term "related services" means transportation, and such developmental, corrective, and other supportive services (including speech-language pathology and audiology services, interpreting services, psychological services, physical and occupational therapy, recreation, including therapeutic recreation, social work services, school nurse services designed to enable a child with a disability to receive a free appropriate public education as described in the individualized education program of the child, counseling services, including rehabilitation counseling, orientation and mobility services, and medical services, except that such medical services shall be for diagnostic and evaluation purposes only) as may be required to assist a child with a disability to benefit from special education, and includes the early identification and assessment of disabling conditions in children. 20 U.S.C. §1401(26).

rules and regulations related to Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. §794 ("Rehab Act"); promulgated; *see also* 34 C.F.R. Subpart D, §104.31- 104.39.  They require the School District regarding a child with a disability to identify the child and give his parents, notice of their child's and their own rights under federal law and rules and relevant Board Policies & Procedures.  The identified student must receive equal opportunity and not be denied the benefits to participate safely in educational services provided their non-disabled peers. The District shall make reasonable modifications in policies, practices or procedures when necessary to avoid discrimination on the basis of disability. The District must consider where applicable, the provision of an *Individual Health Plan*.  The School Board has the duty to assure that Staff is trained on all the above-noted matters.

2.      Emergency Medical Equipment & Training

19.     The School Board has also developed policies and procedures regarding the use of emergency medical equipment and an Automated External Defibrillator, pursuant to Texas Health & Safety Code, Section 779.001; *see also* Board policy CKD (LEGAL) SAFETY PROGRAM/RISK MANAGEMENT - EMERGENCY MEDICAL EQUIPMENT & PROCEDURES.   Among other things, there must be at least one Defribrillator on each campus. The District shall develop safety procedures to respond to the failure of a student to reathing properly.  The District must annually make available to employees and volunteers instruction in the use of a Defibrillator. *See also* DMA (LEGAL) PROFESSIONAL STAFF DEVELOPMENT.

20.     Board Policy FFAC (LEGAL) addresses when a student may be in respiratory distress due to asthma or from anaphylaxis due to an allergy, for instance.   It requires the School Board

First Amended Complaint                                                                                          8

to provide training to staff in this area.  It includes but is not limited to recognizing the signs and symptoms of respiratory distress, administering medication if necessary, implementing emergency procedures when necessary and for the proper sanitization, reuse and disposal of items used during a student's respiratory distress. Training must be provided in accord with Board Policy DMA (LEGAL) PROFESSIONAL STAFF DEVELOPMENT.

21.    Persons working with Special Education students have additional duties.  DBA (LEGAL) EMPLOYMENT REQUIREMENTS, CREDENTIALS; *see also* DMA (LEGAL) PROFESSIONAL STAFF DEVELOPMENT and training requirements.  Contract personnel must also submit and maintain valid credentials and receive all training regular staff receive. DBA (LOCAL) EMPLOYMENT REQUIREMENTS, CREDENTIALS.

22.    The School Board has *not* developed a policy and procedure on how to address choking victims.    Staff were neither supervised nor trained by the Board on this important task. Apparently the School Board permitted District Staff to choose their own methods on how to address choking victims, including apparently not at all.

23.    The School Board has *not* developed a policy and procedure on how to use, safely place, or dispose of soiled items like rubber gloves and other items used by staff to clean students, like S.R.  Staff were neither supervised nor trained on this important task. Here again, the School Board apparently permitted District Staff to choose their own methods on how to address use and disposal of such items, including apparently not at all.

C.    ABOUT SOLIANT HEALTH, LLC

24.    Among other things, on its website Soliant Health states that it "Manages Education And Health Care Professionals In The Field." Additionally, Soliant Health also works to

First Amended Complaint                                                                                    9

"Establish Relationships With Education Professionals[5] and match students seeking work as, for instance, a Speech-Language Pathologist. Soliant Health Health notes that a school-based Speech Language Pathologist plays a special role in the education and social development of students with speech-based disabilities. In order to promote effective outcomes, the school speech language pathologist is required to have the flexibility to work across all school levels, from pre-K to high school. They must also be experienced enough to serve a range of disorders, as notated in the ASHA[6] federal regulations.

25.    Those with a speech therapy job in schools are required to work with students that exhibit communication disorders involving speech, sound, articulation, language, voice and swallowing. to ensure that the social, academic and emotional needs of the student are met in a positive way. They work to provide unique education plans for each individual student, addressing their needs and helping them communicate effectively. In a speech pathology school job, it's required to have great language and literacy skills, as well as the ability to prevent academic failure, collaborate with the community and perform *interventions* (emphasis added) for the students and parents if need be.[7]

26.    To qualify for speech therapy job openings, Soliant Health requires the applicant to have both a bachelor's degree in communication sciences as well as a master's degree in audiology or speech-language pathology, as accredited by the CAA. After acquiring the necessary diplomas, those looking for speech therapy jobs in schools must complete 400 hours of

---

[5].  https://www.soliant.com/about/new-grad-program/

[6].  American Speech-Language-Hearing Association

[7].  https://www.soliant.com/school-healthcare-jobs/school-slp-jobs/

supervised clinical experience, followed by one year of a clinical fellowship (CFY). This requires 36 weeks of full-time clinical practice and hands-on experience. Afterward, the individual must pass the Praxis exam to obtain the ASHA Certificate of Clinical Competence in Speech-Language Pathology. Finally, the person must have a teaching certificate, which qualifies them to practice a speech therapy job in schools.[8]

D.    THE CONTRACT BETWEEN THE SCHOOL BOARD AND SOLIANT LLC

27.    The School Board has promulgated policies and procedures, pursuant to state law, on how to contract for services.  They have developed one such contract with Soliant Health, LLC to place professional staff at the School District when a need for such services arise.  In addition to the rather boiler-plate language the agreement confirms that Soliant Health and its personnel, who are placed at the District, must follow all relevant federal, state and municipal law, rules and regulations. Accordingly, Soliant Health has the duty to assure all of their Staff follow applicable federal, state, local and School Board safety requirements as well.  Any payments from the District, which include both federal, state and local funds would go to Soliant Health directly who in turn would have the duty to pay the person referred to the District or any subcontractor for their work.  Moreover and pursuant to the contract, Soliant Health is responsible for any acts and omissions of the staff and agrees to *Indemnify* the School District arising out of any act or omission of their staff person.

E.    ABOUT JAMILA TRESSI SPENCER

28.    Jamila Tressi Spencer is a Licensed Speech Pathologist Assistant She sought out the placement services available from the Soliant Defendant and was placed as a Speech Intern

---

[8]. https://www.soliant.com/school-healthcare-jobs/school-slp-jobs/

at the Stratford High School.  She was hired in early January of 2023.  She is not paid by the

School District but rather admittedly, has agreed she employed and paid by Soliant Health.

She has previously received CPR Training but no apparent training from the School District

in gneral or as to S.R. in particular.

F.    THE DISTRICT KNEW S.R. REQUIRED CLOSE SUPERVISION

29.    During all times relevant to this case, S.R. received Special Education Services.  The

eligibility requirements for IDEA services have a somewhat different nomenclature than

those for a medical diagnosis. Thus he received IDEA services due to his *Intellectual

Disability* ("ID"), *Visual Impairment* ("VI") and what is termed *Other Health Impaired*

("OHI") which is a catchall for his medical fragility and other conditions.  Because of his

multiple needs and requirement for close supervision S.R. was educated in what is termed

a Self-contained Classroom with other students who also had significant disabling conditions.


30.    The School District has the duty convene what is called an *Admission, Review & Dismissal*

("ARD") Committee Meeting at least annually.  It gave the ARD Team the ability to address

S.R.'s then emerging and changing needs, if any. If necessary the ARDC can request that a

specialized assessment be administered to the student help address educational needs,

problematic behaviors and safety concerns.[9]

1.    Elementary School

---

[9].  Behavior-based treatment options for Pica is especially useful for people who have a developmental disability.  These treatments involve positive reinforcement normal of behaviors and some use aversion therapy. Here a person learns through positive reinforcement which items are good and which ones they should not eat. https://en.wikipedia.org/wiki/Pica_(disorder), *citing* McAdam, David B.; Sherman, James A.; Sheldon, Jan B.; Napolitano, Deborah A. (January 2004). "Behavioral interventions to reduce the pica of persons with developmental disabilities". Behavior Modification. 28 (1): 45–72.. The District didn't ever assess or provide such therapies .

First Amended Complaint                                                                                12

31.   On or about September 30, 2018, while at Nottingham Elementary School and while under the care and (supposed) supervision of the School District, S.R. ingested a binder clip and subsequently began to choke on it. He was hospitalized and intubated because of this incident. Thankfully, the ingestion and surgical removal of the binder clip did not cause him permanent harm.

   2.    Middle School

32.   While in Spring Forest Junior High School, also within SB ISD, S.R. had multiple incidents involving the ingestion of foreign objects. Specifically, on various occasions, S.R.'s parents would often spot foreign non-edible objects in his stool. These objects would include tissue, and one occasion, a piece of rubber. These incidents were brought to SB ISD's attention. Thankfully, ingesting these objects did not appear to cause S.R. harm.

33.   An ARD Committee was convened on or about January 27, 2021. It noted S.R.'s needs for safety and close supervision required placement in a Self-contained classroom. Supervision was especially important when he was moving from place to place. Further, that S.R. had 'a problem putting items in his mouth but responded well to a chewy toy'. With a related meeting shortly thereafter, the notes reflect a particular concern for his safety especially when going to and from the gymnasium. Nevertheless the ARDC did not address these concerns in the IEP nor with an assessment to the behaviors of these concern or for any related services or accommodation.

34.   The IEP reflects that S.R. was to be able to participate in non-academic activities with his non-disabled peers during lunch, assemblies, counseling, athletics, band, clubs, choral groups and recreational activities, but there is nothing in the report showing such services were

actually provided to S.R. The Committee did not believe a formal Safety Plan or Behavioral Intervention Plan was required.  The IEP denotes he was provided a few "Related Services." One was called Adaptive Physical Education ("APE") a specialized program for students who could not participate in regular physical education class to the same extent as his non-disabled peers.  Moreover, unlike regular education students who had physical education class often daily, his was for only 20 minutes, and only once every nine weeks.

35.   What is called a *Full and Individual Exam* ("FIE") was completed on April 19, 2021. The reporter noted a thorough examination of the oral mechanism could not be conducted due to S.R.'s inability to cooperate.  Specifically, it noted that he had previously swallowed a paperclip at school and had to have it removed.  Accordingly, the report again noted there were continuing concerns about S,R. posing a choking hazard and that he needed to be supervised at all times and in all environments.  For that reason, the report noted he often would wear a bandana that hangs on his neck with a teether and/or chewy toy on it.  Further, that because of his unique needs it's important staff be familiar with him as otherwise it would be difficult for an unfamiliar person to know what S.R. would be trying to communicate.  The report reflected that Staff were very concerned about S.R. putting dangerous items in his mouth.  Even after this FIE and the previous concerns the District still did not address these issues in the IEP, with an assessment, or with a BIP or in any accommodations    Importantly, he was dismissed from Speech Therapy, a previously provided related service.

36.   Early in the Fall Semester, on August 20th his teacher put together some notes expressing concern that S.R.'s mother had recently taken a wipe or napkin out of her son's mouth, when

he came home from school.   An informal safety plan was developed for when he was on the school bus to make sure the bus is free from objects he could put in his mouth there.   His teacher, Mrs. Bayorda told the assistants that S.R.'s area should always be free of objects he could put in his mouth, that he should have his mouth checked frequently, that he should be escorted when moving from place to place, should always be supervised and never left alone

37.   An annual ARDC Meeting was convened on February 2, 2022.   It was substantially the same as the one convened in the previous year. It again did not consider the need for a formal safety plan.   Apparently the informal plan of keeping a chewy toy available for S.R. was working as long as it was used consistently though there was no plan put in plce to assue it was provided to him consistently. Staff did not consider a Safety Plan to address those times when S.R. would swallow an item, choke on it and how to respond.

3.      The Fall 2022 High School Semester

38.   An ARD Meeting was convened on August 11, 2022.   It was substantially the same as the one convened in the previous year.

4.      The Spring 2023 High School Semester

39.   An ARD Meeting was convened on January 25, 2023.   It was substantially the same as the one convened in the previous year.   The report noted S.R. needed to demonstrate more adherence to safety rules especially when taken to and from, and while in the gym. The report noted that S.R.'s Mother stated she wanted her son to receive Speech, Occupational and Physical Therapy Services but the ARD Committee refused to consider it.   She also wanted her son to be more actively participate in Physical Education class and specifically asked he be provided one person to be with him during Physical Education Class but the ARD

Committee refused to consider this request also.  S.R.'s Mother then offered that the family would pay for S.R.'s personal caregiver to accompany him during Physical Education class but the ARD Committee rejected this offer also.

40.     Unbeknownst to the family, one way the District tried to keep their son safe  was to keep him secluded  in a haphazardly constructed confined space, approximately four feet by eight feet in the back of the classroom.  The space was tightly enclosed by two bookcases.  He spent much of his time in school in this secluded place and alone.

41.     Just a few days later and on January 31st, when S.R. left school and arrived at home, his mother found him to be in a weak and sluggish condition.  While in this weakened condition S.R. had a hard fall, which paired with his then noticeably anemic condition, caused S.R.'s parents to take him to an emergency room.  By information and belief, the family reasonably believed that S.R. had ingested a foreign object while at school, which became lodged in S.R.'s throat and was later dislodged, likely by his fall.

G.      INCIDENT OF FEBRUARY 6, 2023

42.     S.R. arrived at Stratford High School as usual around 7:00am on February 6, 2023.  It was his first day back at school after the recent incident.  It was also his birthday.

43.     On this day, S.R. was in the care of Ms. Connie Mirasol Bayaborda, Special Education Teacher with SBISD; Mr. John Farah, Substitute Teacher; Ms. Awilda Irizarry, Substitute Teacher and Ms. Beverly Ann Garrett, Paraprofessional.

44.     As noted above, it was a practice for staff in S.R.'s classroom to use gloves while feeding, toileting, and changing the S.R. and the other students. The boxes of gloves were located in

the changing area of the classroom.  The gloves on the wall were easily accessed by anyone and there was nothing set in place to control the dispensing of the product.

45.    Outside the classroom and into the common hallway there was a medical style device with a clear ZIPLOC bag and inside of this bag were multiple rubber gloves.  It too was easily accessible to anyone and had no control for dispensing the product.

46.    Throughout the morning, as evidenced by video surveillance footage obtained from S.R.'s classroom, he is largely ignored by staff and kept in the secluded and confined space.  A male Aide nearby is seen to be sleeping.

47.    At various times, S.R. could be seen with his shirt and/or hands in his mouth.

48.    All the other students in the classroom are engaged in various activities.

49.    Around 9:15am surveillance footage of the changing area in S.R.'s classroom showed that there were some gloves left on the floor. These gloves could have been easily accessed by S.R. and other students.

50.    No one checks on S.R.

51.    Shockingly, at no time during that morning was S.R. provided with the oral chewing device provided by his mother.  This device was instead located in S.R.'s backpack in the classroom and was freely available for use by Staff.

52.    S.R. remains in his restricted and secluded area alone until about 9:53 when an Aide, Theodore Desforges briefly accompanies him out of the secluded area and eturn about ten minutes later.

53.    Between 9:15am and 11:30am, save for this ten minute respite, S.R. is restricted to the back area of his classroom. No one checks on S.R.

First Amended Complaint                                                                                          17

54.    Around 11:30am S.R. was fed lunch in his classroom.  In feeding S.R., Ms. Bayaborda used rubber gloves.  At this time, S.R.'s airway was not obstructed.

55.    After feeding S.R. lunch, Ms. Bayaborda and one other SB ISD employee entered the changing area to change S.R.'s diaper, and to place S.R.'s soiled shirt into the washing machine.  Per their usual practice and as would be expected, SB ISD Staff wore gloves. Upon exiting the changing room, the other employee had her gloves on but Ms. Bayaborda had removed her gloves.

56.    At approximately 12:03pm, S.R. is seen walking around the gym.  Other students are walking, running and playing but he is alone. Over the next few minutes Beverly Ann Garrett, Jamila Tressie Spencer, Speech Intern and Awilda Irizarry enter the gym.  They are all there to supervise.

57.    At about 12:40pm S.R. leans his body against a wall and he falls down to the floor on all fours. Spencer does not respond.  Awilda Irizarry actually walks by S.R. while he is on the floor but does nothing.  Theodore Desforges enters the gym and he too passes by S.R. while he is lying on the floor and likewise does nothing.

58.    At approximately 12:59pm, S.R. is seen dragging his knees across the gym for a few seconds then gets up and starts walking again. At approximately 1:05pm, he goes to a side of the gym and Spencer keeps looking down at her hand, likely at a phone or tablet. A few minutes later S.R. is seen with hands by his mouth.

59.    At approximately 1:12pm-1:13pm he again drops down on the floor on all fours and just moments later hits his head on the floor.  Farah appears on camera for about a minute, moves

on, and does nothing.  Minutes later S.R. stands up and starts staggering and then trips on a student who is sitting in a chair.  He had already turned a bluish color.

60.     At approximately 1:19pm, Spencer finally observes S.R. and calls out to Bayaborda. Irizarry then also comes over to check on him. She gets on a cellular phone device and makes a call. S.R. was put on his side by Bayaborda.   Neither she, Spencer nor anyone provided CPR or checked for any objects in his mouth.  At approximately 1:20pm, Blake Lassiter brought in an automated external defibrillator (AED)..

61.     CPR was only administered after the arrival of Ms. Shannon Etheridge, RN who continued to do so until EMS arrived.  She too did not check for any objects in his mouth

62.     After EMS arrived and the decision was made to bring S.R. to the hospital, EMS staff quickly determined that S.R. had an obstruction in his airway. This was simply removed with forceps and S.R. was intubated.

63.     The item recovered from S.R.'s airway was a portion of a purple medical glove, which matched those used in his classroom and in his changing room.

64.     Multiple SB ISD employees and Spencer were in the gymnasium at this time.  Strangely, there was not a single person specifically tasked with supervising S.R. during this period; instead, all of those present, the SB ISD staff and Spencer were all expected to monitor and provide constant supervision of S.R. but did not.

65.     Unfortunately, however, and as feared by S.R.'s mother, S.R. ambled unsupervised through the gymnasium.  Had the SB ISD employees or Spencer had been supervising S.R., they would have seen that on numerous occasions, S.R. was in visible distress.

66. Instead of watching, assisting, or investigating S.R.'s distress, multiple SB ISD employees walked around and even over him, while he was struggling to breathe.

67. Notwithstanding the multiple failures to keep the environment safe, and the multiple failures to supervise R.S. closely as everyone knew was required, and the multiple failures to respond to S.R, in distress, if Ms. Shannon Eldridrge, R.N. or someone else had been trained in how to deal with an obstructed airway S.R. would very well be alive today,

H.    AFTERMATH OF THE INCIDENT

68. S.R. remained in critical condition in the Intensive Care Unit at the Texas Children's Hospital West Campus.

69. Ultimately, S.R. would pass away on February 8, 2023. S.R. had just turned fifteen (15) years old on the day of the incident.

70. S.R.'s cause of death was determined to be 'Asphyxia due to obstruction of airway by foreign object (glove) in a person with Williams-Beuren Depletion Syndrome.

## VI.  STATE ACTION

71. Plaintiffs incorporate by reference all the above-related paragraphs, and each one below, incorporates by reference the one above, as well as those below, with the same force and effect as if herein set forth.

72. Here the School District was at all times and in all matters acting under color of state and federal law when it permitted B.P. to be subjected to the acts, omissions, wrongs and injuries hereinafter set forth.

## VII. CLAIMS PURSUANT TO THE UNITED STATES CONSTITUTION

A.    4th AMENDMENT CLAIM

73.    Plaintiffs assert that S.R. had a right, while alive to be free from unreasonable and unnecessary seclusion, which violated his rights pursuant to the 4th Amendment to the United States Constitution for which his parents seek recovery pursuant to 42 U.S.C. §1983.

B.    Claims Pursuant To The 14th Amendment

  1.    Policy and Practice

74.    During the relevant time period contemplated by this cause of action, the School Board by and through its designees—had an actual policy, practice, and custom of conscious and deliberate indifference to federal and state law, federal and state administrative directives, and their own policies and procedures regarding the treatment of S.R.  Such failures were a moving force in the injuries to him and his decease, for which his parents seek recovery pursuant to 42 U.S.C. §1983.

  2.    Due Process Claims.

75.    Plaintiffs contend that SB ISD School Board failed to sufficiently supervise staff in regard to addressing the needs of children in general– and especially a student with a disability like S.R., thereby violating his rights pursuant to the Fourteenth Amendment of the Constitution of the United States, for which Plaintiffs seek recovery pursuant to 42 U.S.C. §1983.

76.    Plaintiffs further assert that SB ISD School Board failed to sufficiently train staff to address the needs of children in general– and especially a student with a disability like S.R., thereby violating his rights pursuant to the Fourteenth Amendment of the Constitution of the United States, for which Plaintiffs seek recovery pursuant to 42 U.S.C. §1983.

  3.    Equal Protection Claim

77.    The failures by SB ISD School Board were a moving force in violating the rights of S.R., as a class of one, as contemplated by the Equal Protection of the Fourteenth Amendment of the Constitution of the United States for which they seek recovery pursuant to 42 U.S.C. §1983.

## VIII.  SECTION 504 OF THE REHABILITATION ACT OF 1973 CLAIMS

78.    The School District receives federal funds and thus must follow the requisites of Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. §794 ("Section 504").

79.    The implementing regulations of Section 504 require that each state that receives disbursements, including the state's political subdivisions such as local school districts, must ensure all students with disabilities are given appropriate and necessary accommodations, pursuant to federal law and rules. To the degree that a policy or practice hinders honest consideration of a disabled student's unique and individualized needs, and fails to accommodate that child's disability and keep the student safe, it violates Section 504.

A.    PROFESSIONAL BAD FAITH OR GROSS MISJUDGMENT CLAIM

80.    Plaintiffs assert that the School District demonstrated professional bad faith or gross misjudgment and/or mismanagement of S.R.'s educational plan, also violating Section 504 of the Rehabilitation Act thereby.

B.    FAILURE TO KEEP SAFE CLAIM

81.    In addition and in alternative to the above, Plaintiffs assert that the School District failed to provide S.R. a safe and non-hostile educational environment, and as such he is a victim of discrimination based upon disability pursuant to Section 504.

C.    DISPARATE TREATMENT

82.     The above noted facts also support a plausible "Disparate Treatment Claim" also pursuant to the Rehabilitation Act.

D.     FAILURE TO ACCOMMODATE CLAIM

83.     The above noted facts also support a plausible "failure to accommodate" claim pursuant to the Rehabilitation Act (and similar to the ADA claim noted below) as to the School District.

84.     As the Soliant Health, LLC Defendant receives federal monies and agreed by contract to follow all relevant federal law, they too must adhere to the requisites of the Rehabilitation Act.  Because their employee did not do so, they are liable to Plaintiffs for the failures to accommodate the disabilities of S.R. pursuant to the theory of Respondeat SuperiorS.R. was not .

## IX.   CLAIMS RELATED TO THE AMERICANS WITH DISABILITIES ACT

85.     In addition, and in the alternative to the above, the facts as previously described demonstrate that S.R. was a victim of discrimination based upon disability by the School District.  He, by and through his parents, thus has a plausible claim pursuant to the Americans with Disabilities Act, 42 U.S.C. §12131, et seq ("ADA").

## X. CLAIMS PURSUANT TO STATE AND COMMON LAW

A.     NEGLIGENCE BY JAMILA TRESSIE SPENCER

86.     Plaintiffs allege that at the time of S.R.'s injury, on February 6, 2023, that Jamila Tressie Spencer had a duty to monitor, supervise, protect, and/or to render aid to S.R.  Jamila Tressie Spencer breached this duty by failing to monitor, supervise, protect, and/or to render aid to S.R.  Jamila Tressie Spencer's breach of duty was a proximate cause of S.R.'s choking injury on February 6, 2023, and subsequent death on February 8, 2023, equating to negligence.

B.    GROSS NEGLIGENCE BY JAMILA TRESSIE SPENCER

87.    Plaintiffs incorporate by reference all the above-related paragraphs with the same force and

effect as if herein set forth and each paragraph below incorporates by reference also as if

fully set forth herein, the ones above it.  Plaintiffs allege that at the time of S.R.'s injury, on

February 6, 2023, Jamila Tressie Spencer had a duty to monitor, supervise, protect, and/or

to render aid to S.R.  Jamila Tressie Spencer breached this duty by failing to monitor,

supervise, protect, and/or to render aid to S.R.  Jamila Tressie Spencer's breach of duty was

a proximate cause of S.R.'s choking injury on February 6, 2023, and subsequent death on

February 8, 2023, equating to gross negligence.

C.    NEGLIGENCE BY SOLIANT HEALTH

88.    At the time of S.R.'s injury on February 6, 2023, Jamila Tressie Spencer was acting within

the course and scope of her employment with Soliant Health.  Accordingly, Soliant Health

is liable for the actions of its employee or agent, Jamila Tressie Spencer, under the legal

doctrine of Respondeat Superior.   Therefore, Soliant Health is liable to Plaintiffs for

negligence.

89.    Further, Soliant Health ratified the acts, omissions and customs of its own personnel and

staff.  As a result, Soliant Health is responsible for the acts and omissions of staff persons,

including Jamila Tressie Spencer, who were otherwise responsible for the safety of and

services for S.R.

90.    Additionally, Soliant Health had a duty to exercise reasonable care in the hiring, training, and

supervision of its employees, including Jamila Tressie Spencer.  As an employer, Soliant

Health had a duty to ensure that its employees were properly trained and equipped to perform their duties safely and in accordance with applicable laws and standards.

91.    Soliant Health breached its duty of care by failing to adequately train its employee, Jamila Tressie Spencer. Soliant Health knew or should have known that the lack of adequate training exposed students like S.R. to a significant risk of harm.

92.    As a direct and proximate result of Soliant Health's failure to train its employee, Jamila Tressie Spencer, S.R. suffered injuries on or about February 6, 2023, and subsequently died on February 8, 2023.  Had Soliant Health properly trained Jamila Tressie Spencer, S.R.'s death would not have occurred.

D.    GROSS NEGLIGENCE BY SOLIANT HEALTH

93.    At the time of S.R.'s injury on February 6, 2023, Jamila Tressie Spencer was acting within the course and scope of her employment with Soliant Health.  Accordingly, Soliant Health is liable for the actions of its employee or agent, Jamila Tressie Spencer, under the legal doctrine of Respondeat Superior.  Therefore, Soliant Health is liable to Plaintiffs for gross negligence.

94.    Further, Soliant Health ratified the acts, omissions and customs of its own personnel and staff.  As a result, Soliant Health is responsible for the acts and omissions of staff persons, including Jamila Tressie Spencer, who were otherwise responsible for the safety of and services for S.R.

G.    WRONGFUL DEATH & SURVIVAL CLAIMS- UNDER CHAPTER 71 OF THE TEXAS CIVIL PRACTICE AND REMEDIES CODE

95.    As discussed herein, Plaintiffs allege that S.R.'s death was caused by the negligence and gross negligence of Jamila Tressie Spencer and Soliant Health, who breached their duty of

care to S.R. Plaintiffs reasonably believe that had S.R., survived, he would have had capacity to seek damages on this claim. Further, S.R.'s heirs and beneficiaries suffered due to this breach and S.R.'s subsequent death.

## XI. RATIFICATION AND RESPONDEAT SUPERIOR

96. The Defendant SBISD School Board ratified the acts, omissions and customs of school district personnel and staff. As a result, the School Board is responsible for the acts and omissions of staff persons who were otherwise responsible for the education, safety and provision of services to S.R.

97. Additionally, the School Board is responsible for the acts and omissions of staff persons who were otherwise responsible for the duty to provide S.R. keep him free from discrimination based upon disability, all pursuant to the theory of Respondeat Superior.

98. Further, the Defendant Soliant Health ratified the acts, omissions and customs of its own personnel and staff. As a result, the Soliant Health is responsible for the acts and omissions of staff persons, including and especially Spencer who were otherwise responsible for the safety of and services for S.R.

## XII. SPOLIATION

99. Plaintiffs hereby requires and demands that Defendants preserve and maintain all evidence pertaining to any claim or defense related to violations, causes of action, facts, and resulting damages set forth herein and/or made the basis of this petition and request for due process, including– but not limited to– statements, photographs, videotapes, audiotapes, surveillance, security tapes, business or medical records, incident reports, telephone records, emails, text

messages, electronic data/information, and any other evidence, potential evidence, or potentially discoverable documents.

100.    Failure to maintain such items will constitute "spoliation" of evidence, which will necessitate use of the spoliation interference rule—an inference or presumption that any negligent or intentional destruction of evidence was done because the evidence was unfavorable to the spoliator's case.

## XIII.  DAMAGES

101.    Plaintiffs  incorporate by reference all the above-related paragraphs with the same force and effect as if herein set forth.

102.    As a direct and proximate result of the Defendants' conduct, R.S. suffered– and Plaintiuffs suffered and continue to suffer– injuries and damages for which they are entitled to recover herein, jointly and severally against all Defendants, including but not limited to:

a.      Nominal and consequential damages;

b.      Loss of past educational opportunities;

c.      Loss of future educational opportunities;

d.      Pain and suffering in the past;

e.      Pain and suffering in the future;

f.      Mental anguish in the past;

g.      Mental anguish in the future; and

h.      Various out-of-pocket expenses incurred by S.R.'s family but for the acts and omissions of Defendants.

103.    Defendants are jointly and severally responsible for damages.

## XIV.  DEMAND FOR JURY TRIAL

104.    Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a jury trial for all issues

in this matter.

## PRAYER

**WHEREFORE, PREMISES CONSIDERED,** Plaintiffs pray in the manner and particulars

noted above, for the Court to enter a judgment against Defendants jointly and severally in an amount

sufficient to fully compensate them for the elements of damages enumerated above, judgment for

damages, recovery of attorney's fees and costs for the preparation and trial of this cause of action,

equitable relief requested and for its appeal if required, pursuant to the ADA and Section 504, the

United States Constitution, and the Common Law, together with pre- and post-judgment interest, and

court costs expended herein, and for such other relief as this Court in equity, deems just and proper

and for such other relief as the Court may deem just and proper in law or in equity.


Respectfully submitted,
/s/ Martin J. Cirkiel
Martin J. Cirkiel
State Bar No. 00783829
Marty@cirkielaw.com [Email]
Cirkiel Law Group, P.C.
1005 West 41st Street, Suite 201
Austin, Texas 78756
(512) 244-6658 [Telephone]
(512) 244-6014 [Facsimile]; and

Mr. Kenneth Rhodes
Mr. Matthew Humble
Rhodes Humble LLP
203 N. Houston Ave.
Cameron, Texas 76520
(979) 459-9888 [Telephone]
krhodes@rhodes-humble.com [Email]

mhumble@rhodes-humble.com [Email]

COUNSEL FOR PLAINTIFFS

<u>**CERTIFICATE OF SERVICE**</u>

   The undersigned hereby certifies that a true and correct copy of the foregoing has been forwarded to all parties on this the 12th day of May, 2025, in accordance with the Federal Rules of Civil Procedure and the Court's electronic filing system.

Mr. Paul A. Lampt, Attorney
State Bar No. 24002443
Federal I.D. 21711
plamp@snll-law.com [Email]
Ms. Melissa M. Gins, Attorney
State Bar No. 24074671
Federal I.D. 2089537
mgoins@snll-law.com [Email]
3700 Buffalo Speedway, Suite 500
Houston, Texas 77098
(713) 993-7060 [Telephone]
(888) 726-8374 [Facsimile]
Attorneys For Spring Branch Independent School District

Mr. Chris Raney, Attorney
State Bar No. 24051228
craney@grsm.com [Email]
Ms. Kayla C. Miller, Attorney
State Bar No. 24094589
kmiller@grsm.com [Email]
Gordon Rees Scully Mansukhani LLP
1900 West Loop South, Suite 1000
Houston, Texas 77027
(713) 961-3366 (Telephone)
(713) 961-3938 (Facsimile)
Attorneys for Defendants Soliant Health, LLC
d/b/a Soliant Health
and Jamila Tressie Spencer